# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-60495

---

EXXONMOBIL RESEARCH & ENGINEERING COMPANY,
INCORPORATED, now known as ExxonMobil Technology
and Engineering Company,

*Petitioner/Cross-Respondent,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

---

ON APPEAL FROM THE NATIONAL LABOR RELATIONS BOARD

## PETITION FOR REHEARING *EN BANC*

---

MICHAEL F. SMITH
THE SMITH APPELLATE LAW FIRM
1717 Pennsylvania Ave. NW
  Suite 1025
Washington, D.C.  20006
(202) 454-2860
smith@smithpllc.com

DANIEL D. SCHUDROFF
JACKSON LEWIS P.C.
666 Third Avenue
  28th Floor
New York, New York 10017
(212) 545-4000
daniel.schudroff@jacksonlewis.com

*Attorneys for Petitioner/Cross-Respondent*

---

CP COUNSEL PRESS   (800) 4-APPEAL • (380734)

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

1.  Pursuant to 5th Cir. R. 28.2.1, the number and style of the case are as follows: *ExxonMobil Research & Engineering Co. v. NLRB*, 132 F.4th 337 (5th Cir. 2025), Case No. 23-60495, Board Cases No. 22-CA-218903, 22-CA-223073, and 22-CA-232016.

2.  Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record for Petitioner-Cross-Respondent certifies that ExxonMobil Research & Engineering Company, Inc. is wholly owned by Exxon Mobil Corporation, a publicly traded corporation.

3.  The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

    ExxonMobil Research & Engineering Company, Inc., now known as ExxonMobil Technology and Engineering Company, Petitioner-Cross-Respondent

    National Labor Relations Board, Respondent – Cross Petitioner

    Independent Laboratory Employees Union, Inc. ("ILEU" or "Union")

David Tykulsker

Joanna Pagones Ross

Suzanne Sullivan

Craig Stanley

Eva Shih

Jonathan Spitz

Daniel Schudroff

Ruth Burdick

Micah Jost

Kira Dellinger Vol

Michael F. Smith

/s/ Michael F. Smith
*Co-counsel for Petitioner/*
*Cross-Respondent ExxonMobil*
*Research & Engineering Co*

# FED. R. APP. P. 40(b)(2) STATEMENT

In September 2020, a three-Member panel of Respondent/Cross-Petitioner National Labor Relations Board ("NLRB" or "Board"), following a full adjudication, unanimously cleared Petitioner/Cross-Respondent ExxonMobil Research & Engineering Co. ("ExxonMobil") of all unfair labor practice charges relating to 2018 contract negotiations with the union representing 165 workers at its New Jersey research facility.

In early 2021, President Biden took office, promising to be "the most pro-union President you've ever seen" and immediately declaring war on America's oil industry. Months later, NLRB staffers declared that a Republican Board member who participated in ExxonMobil's case – and who was leaving the Board the next day – held shares of an energy-sector stock fund whose holdings included unspecified amounts of ExxonMobil. Staff determined his disqualification was required even though fund statements did not disclose the ExxonMobil stock, and he had no knowledge of it. ROA.3044 (Member Ring dissenting in part). Only after the Board ceased having a Republican majority months later did it vacate and reopen the proceedings, but rather than have the two

remaining Members from the 2020 Decision re-decide the case, themselves or with a new third Member, the Democrat-dominated Board did so. In 2023, it found ExxonMobil liable for NLRA violations – five years after the events at issue, and three years after ExxonMobil was cleared. This Court now has affirmed in a published opinion.

That opinion raises two issues of exceptional importance, which also conflict with authority from the Supreme Court and this Court, respectively. First, the opinion gives this Court's blessing to the NLRB's politically suspect reopening and re-adjudication of this matter, **_years_** after it was fully resolved, and under highly questionable circumstances. Given the unusual statutory provisions governing the finality of Board decisions, the opinion if not vacated will become a roadmap guaranteeing similar shenanigans every time the White House changes parties, not only upending Federal labor law but flooding circuit courts with baseless prophylactic petitions.

It also contravenes *Williams v. Pennsylvania*, 579 U.S. 1 (2016), under which the two unconflicted Board members should have

redecided the case. Grounds for review exist under Fed. R. App. P. 40(b)(2)(A) and (D).

The opinion raises a second significant issue regarding employers' First Amendment rights, and conflicts with the plurality opinion in *Tesla, Inc. v NLRB*, 120 F.4th 433 (5th Cir. 2024) (en banc), and decisions of several other circuits. En banc consideration of this significant issue is needed to secure and/or maintain uniformity in this Court's decisions. Fed. R. App. P. 40(b)(2)(A), (C) and (D).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS……………………...……i

FED. R. APP. P. 40(b)(2) STATEMENT……………………………...…iii

TABLE OF AUTHORITIES……………………………………………viii

COURSE OF PROCEEDINGS AND DISPOSITION
OF THE CASE…………………………………………………..…1

STATEMENT OF FACTS NECESSARY TO ARGUMENT…………….5

I.    The union seeks something for nothing…………………………5

II.   The NLRB unanimously exonerates ExxonMobil……………..…8

III.  A new Administration declares war on oil and management, the
Board undoes its ruling for ExxonMobil and re-adjudicates it
under a Democratic majority, and this Court affirms…………..…9

ARGUMENT and AUTHORITIES……………………………………10

I.    The opinion's approval of the NLRB's machinations will
exacerbate Federal labor law's politicization, and conflicts with
Williams…………………………………………………….......10

      A.    Preserving some semblance of "law" in Federal
labor law presents a question of exceptional importance….10

      B.    The opinion contravenes *Williams*……………………..14

II.   The *en banc* Court should clarify and apply Tesla so
ExxonMobil's factual, non-coercive speech receives
Constitutional protection………………………………….......15

CONCLUSION………………………………………………………20

CERTIFICATE OF SERVICE…………………………………………21

CERTIFICATE OF COMPLIANCE...................................................22

ADDENDUM – Panel Opinion

# TABLE OF AUTHORITIES

**Page(s)**

## Constitutional provision

U.S. Const., Am. I.....................................................................15-19

## Cases

*Branum v. Commissioner,*
    17 F.3d 805 (5th Cir. 1994)..................................................13

*Chaney v. Kellogg Co.,*
    1989 U.S. Dist. LEXIS 3989 (E.D. Pa. 1989)................................18

*Charge Card Ass'n v. NLRB,*
    653 F.2d 272 (6th Cir. 1981)................................................18

*Dow Chemical Co. v. NLRB,*
    660 F.2d 637 (5th Cir. 1981).................................................18

*ExxonMobil Research & Engineering Co. v. NLRB,*
    132 F.4th 337 (5th Cir. 2025)..........................................*passim*

*FDRLST Media, LLC v. NLRB,*
    35 F.4th 108 (3d Cir. 2022)..................................................16

*Gulf States Mfrs., Inc. v. NLRB,*
    579 F.2d 1298 (5th Cir. 1978)................................................19

*Harris v. Bessent*, 2025 U.S. App. LEXIS 8151 (D.C. Cir. 2025),
    *stay granted sub. nom., Wilcox v. Trump,*
    __ U.S. __, 2025 U.S. LEXIS 1453 (Apr. 9, 2025)..........................12

*Louisiana v. Biden,*
    45 F.4th 841 (5th Cir. 2022).................................................2

## Cases (cont'd)

*NLRB v. Carilli,*
    648 F.2d 1206 (9th Cir. 1981)……………………………………18

*NLRB v. Gissel Packing Co.,*
    395 U.S. 575 (1969)………………………………………..……18

*NLRB v. Herman Sausage Co.,*
    275 F.2d 229 (5th Cir. 1960)………………………...………18

*NLRB v. Proler Int'l Corp.,*
    635 F.2d 351 (5th Cir. 1981)………………………...……………18

*Roper Corp. v. NLRB,*
    712 F.2d 306 (7th Cir. 1983)………………………………17, 18

*Tesla, Inc. v NLRB,*
    120 F.4th 433 (5th Cir. 2024) (en banc)……………...…………v, 15-17

*Williams v. Pennsylvania,*
    579 U.S. 1 (2016)……………………………………v, 14-15

## Statutes and court rules

18 U.S.C. 208……………………………………..………...…3

29 U.S.C. 158(c)…………………………………………18

29 U.S.C. 160(d)…………………………………....11, 12, 13

29 U.S.C. 160(f)……………………………………………11

Fed. R. App. P. 40(b)(2)(A)……………………………..v, 15

Fed. R. App. P. 40(b)(2)(C)……………………………v, 15

**Statutes and court rules (cont'd)**

Fed. R. App. P. 40(b)(2)(D)……………………………………………..v, 15

**Administrative decisions**

*ExxonMobil Research & Engineering Co.*,
  370 NLRB No. 23 (2020)………………………1, 3, 4, 8, 9, 10, 14, 18, 19

**Other authorities**

Associated Press, *The Latest: Biden revs up union members in Pittsburgh area* (Nov. 2, 2020)……………………………………..…….…2

Brudney, *Isolated and Politicized: The NLRB's Uncertain Future*,
  26 Comp. Lab. L. & Policy J. 221 (Winter, 2005)……………………...12

Democratic Party Platform (July 27, 2020)……………………….……..2

Dolin, *Estreicher Urges Reforms to Address NLRB "Policy Oscillation,"*
ABA Labor and Employment Law 2 (Spring 2005)………………………13

Executive Order 14,008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619 (Jan. 27, 2021)……………………………..…..2

National Labor Relations Board,
  *General Counsels Since 1935*…………………………………………..……..2

National Labor Relations Board,
  *Members of the NLRB Since 1935*……………………………….……..2, 3, 4

## COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

In 2018-19, ExxonMobil and the union representing 165 employees at its Annandale, N.J. research facility negotiated for a successor collective bargaining agreement ("CBA"), resolving 50 of 54 issues over 23 bargaining sessions. ROA.3024-33. Nonetheless, the NLRB's General Counsel alleged various bargaining violations by ExxonMobil of the National Labor Relations Act ("Act") during negotiations. ROA.3018.

Trial occurred March 19-21, 2019 before ALJ Rosas, who on June 12, 2019 held ExxonMobil violated the Act in several respects. ExxonMobil filed exceptions. ROA.2995-3009.

On Sept. 28, 2020, an NLRB panel comprising Republican Members John Ring, Marvin Kaplan and William Emanuel issued its Decision and Order reversing the ALJ, finding no violations and dismissing the Complaint. ROA.3011-40. The union never sought judicial review.

During that fall's presidential campaign, Joe Biden promised to ban oil and gas permitting on public lands and waters and impose

"climate costs" on oil companies,[1] and to "be the most pro-union president you've ever seen."[2] Within 24 hours of taking office he upended the NLRB, replacing Ring as Chair with the Board's only Democrat, and firing the General Counsel with 10 months left on his term.[3] Six days later President Biden issued Executive Order 14,008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021), "paus[ing]" new oil and gas leases on public lands and offshore waters. *Louisiana v. Biden*, 45 F.4th 841, 843 fn. 1 (5th Cir. 2022) (cleaned up).

On May 27, 2021, the NLRB's Office of Inspector General (OIG) began investigating Emanuel based on staff's review of his annual

---

[1] Democratic Party Platform (July 27, 2020), pp. 52-55, https://nsarchive.gwu.edu/document/20551-2020-democratic-party-platform-july-27-2020 (visited April 25, 2025).

[2] Associated Press, *The Latest: Biden revs up union members in Pittsburgh area* (Nov. 2, 2020), https://columbiabasinherald.com/news/2020/nov/02/the-latest-biden-revs-up-union-members-in-2/ (visited Apr. 25, 2025).

[3] National Labor Relations Board, *Members of the NLRB Since 1935* https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935; *also* NLRB, *General Counsels Since 1935*, https://www.nlrb.gov/about-nlrb/who-we-are/general-counsel/general-counsels-since-1935 (each visited Apr. 25, 2025).

financial disclosure. ROA.3050.

On Aug. 4, 2021, Democrat Gwynne Wilcox joined the Board, trimming the Republican majority to 3-2. https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935.

On Aug. 26, 2021, eight months after the Decision and Order and one day before Emanuel's planned departure, the OIG opined that with regard to five NLRB matters Emanuel participated in, including this one, he held an interest worth more than $50,000 in a stock sector fund whose holdings included the company involved. ROA.3050-57. Emanuel disavowed knowledge of ExxonMobil holdings, but the OIG found a financial conflict of interest under 18 U.S.C. 208. *Id.*

On Aug. 27, 2021, Emanuel left the NLRB, changing its Republican majority to a 2-2 split. https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935.

On Sept. 22, 2021, David Prouty joined the Board, creating a 3-2 Democrat majority. *Id.*

On Jan. 7, 2022, the Board issued a Notice of its intent to vacate the September 2020 Decision and Order and re-adjudicate ExxonMobil's exceptions, and directing the parties to show cause why it shouldn't.

ROA.3041-49. Ring partially dissented. ROA.3042-48. Since the Union never petitioned for review of the 2020 Decision and Order, this was the first communication ExxonMobil received regarding this matter since September 2020.

On Feb. 11, 2022, ExxonMobil opposed the proposal, arguing vacatur and re-adjudication were inappropriate, but that if they were undertaken, the two remaining 2020 panel members should participate. ROA.3145-67.

On Aug. 19, 2022, an NLRB panel majority comprising Democratic Chair McFerran and Wilcox vacated the September 2020 Decision and Order; Ring dissented. ROA.3191-3205.

On Dec. 16, 2022, Ring left the Board, creating a 3-1 Democrat majority. https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935.

On Aug. 25, 2023, all four Board members issued a new Decision and Order. ROA.3206-45. The Board again rejected most charges but found ExxonMobil violated the Act as to paid parental time off ("PPTO") and personal time.  Kaplan, the sole remaining Republican, dissented, arguing the 2020 Decision and Order should not have been vacated.

Prouty thought ExxonMobil committed additional violations.

On Sept. 15, 2023, this Court docketed ExxonMobil's petition to review the 2023 Decision and Order. The Board cross-petitioned for enforcement.

On Nov. 4, 2024, Judges Richman, Graves and Ramirez heard argument, and on March 12, 2025, the panel issued its published opinion denying ExxonMobil's petition and granting the Board's cross-petition. *ExxonMobil Research & Engineering Co. v. NLRB*, 132 F.4th 337 (5th Cir. 2025). Addendum.

## STATEMENT OF FACTS NECESSARY TO ARGUMENT

**I.      The union seeks something for nothing.**

In 2017, ExxonMobil adopted a policy giving non-represented employees eight weeks' PPTO for a child's adoption or birth. ROA.82-83. It could not extend the benefit to represented employees without negotiating with their union. ROA.161-62.

Russ Giglio, R&D Business Advisor and Department Head of Business Support, led ExxonMobil's bargaining team for the 2018-19 contract negotiations, while President Michael Myers headed the Union's. ROA.35, 265, 753-2615. On bargaining's first day, the Union asked for PPTO, offering nothing in return. ROA.81-82; 1266. It

persisted throughout negotiations, though Giglio as early as the fifth session explained, "PPTO is not free, which is why it need[s] to be discussed in bargaining." ROA.1266-67.

In negotiations June 5 and 8, Giglio offered represented employees one week of PPTO, a "significant and unprecedented" offer no other union-represented group received. ROA.1821-22; 1827.

Throughout negotiations the Union asked why ExxonMobil wouldn't simply give eight weeks' PPTO. Giglio explained bargaining-unit employees receive certain benefits unrepresented employees didn't, and PPTO must be bargained like the rest of their package. ROA.163-65, 173, 268-269, 1266-73, 1835-41, 2505-06. This was especially so since once a benefit like PPTO is included in a contract, it is difficult to remove. ROA.164.

On July 9, 2018, the parties met for the fifteenth bargaining session, having had at least that many conversations about PPTO. Myers again asked "what it would take to get" PPTO? ROA.108, 269-270, 2170. Giglio, sarcastically and out of frustration, responded "[w]alk away from the bargaining agreement." *Id.* This, of course, was true: every non-represented employee receives eight weeks' PPTO. As Giglio

explained, "[i]f you weren't covered by a Collective Bargaining Agreement, if you were exempt, you would have eight weeks of PPTO." ROA.2171.

Myers asked "[s]o you are saying if [we get decertified], you will give us eight weeks of PPTO?" ROA.2171-72. Giglio replied, "You said that, I didn't…" and reiterated ExxonMobil had already offered one week of PPTO. *Id.* Myers understood Giglio's comment to mean that if Clinton employees weren't covered by a CBA, they would get PPTO "just like every other employee." ROA.168. Again, this was true: as everyone knew, all non-represented employees receive eight weeks' PPTO. ROA.168-169, 349; 2177 (Union Treasurer Ferro: "[w]e have a CBA, so certain benefits don't get applied to us").

Union officials recognized Giglio's comment as sarcasm. Myers acknowledged it came at the end of a long day of bargaining, when he, too, was frustrated. ROA.108-109, 166. VP Fredrickson laughed, calling the comment "absurd." ROA.351. Myers confirmed he would not entertain getting rid of the Union in exchange for PPTO and gave the Company no reason to believe otherwise. ROA.172. Giglio never thought the Union would "walk away" in exchange for PPTO. ROA.270. He

repeated he was there to bargain, was looking for a quid pro quo, and that the Union could obtain PPTO through bargaining. ROA.170-72, 1274.

The nearly 2,000-page bargaining record reflects Giglio made this comment once, and never in a sidebar nor at any other point. ROA.270, 261-62. ExxonMobil kept bargaining over PPTO following the July 9 session, ultimately offering one week, the same it had recently agreed to in collective-bargaining negotiations for a Montana site, and more than the PPTO agreements at two other sites. ROA. 163,171-72,1816.

## II.    The NLRB unanimously exonerates ExxonMobil.

The ALJ issued his decision June 12, 2019, finding for ExxonMobil on some allegations and the General Counsel on others. ROA.2938-85.

ExxonMobil filed exceptions. ROA.2995-3009. In a unanimous September 28, 2020 Decision and Order, Members Kaplan, Ring and Emanuel found ExxonMobil bargained in good faith and did not violate the NLRA, reversing the ALJ and dismissing the Complaint. ROA.3011-40. *ExxonMobil Research & Engineering Co.*, 370 NLRB No. 23 (2020). The Board held Giglio's July 9 statement could not reasonably be viewed as a serious promise of PPTO in exchange for abandoning the

Union. ROA.3015-16, fns. 14, 11 (citation omitted).

### III. A new Administration declares war on oil and management, the Board undoes its ruling for ExxonMobil and re-adjudicates it under a Democratic majority, and this Court affirms.

President Biden took office in January 2021 and immediately declared war on the domestic oil industry and on management. In May, the Board's OIG began investigating Emanuel and in late August – one day before his departure – opined he had a conflict of interest and shouldn't have sat on this case and four others. Combined with two Democratic members joining in August and September 2021, Emanuel's departure turned a 3-1 Republican Board majority to a 3-2 Democratic majority.

On Jan. 7, 2022, with ExxonMobil believing this matter finished 16 months earlier, the Board issued a Notice to Show Cause stating its intent to vacate the 2020 Decision and Order, over Ring's dissent. ROA.3041-49. ExxonMobil objected re-adjudication was inappropriate – or at most, the two remaining Members should issue a new Decision.

Board staff offered nothing showing what percent of the stock fund's holdings were ExxonMobil, nor how much (if any) of Emanuel's $63,000 in fund holdings they represented. Instead, they offered an

anonymously compiled list purporting to show the fund's transactions in ExxonMobil stock from 1/13/20 through 6/7/21. ROA.3059.

On Aug. 19, 2022, Chair McFerran and Wilcox vacated the September 2020 Decision and Order, again over Ring's dissent. R.3191-3205. One year later, after Ring's departure, the Board in August 2023 issued a new Decision and Order holding ExxonMobil violated § 8(a)(1) because of Giglio's statements about PPTO. ROA.3206-21. ExxonMobil petitioned for review; the Board cross-petitioned for enforcement.

The panel denied ExxonMobil's petition and granted the Board's cross-petition. *ExxonMobil Research & Engineering Co. v. NLRB*, 132 F.4th 337 (5th Cir. 2025).

## ARGUMENT and AUTHORITIES

**I.    The opinion's approval of the NLRB's machinations will exacerbate Federal labor law's politicization, and conflicts with Williams.**

**A.    Preserving some semblance of "law" in Federal labor law presents a question of exceptional importance.**

The facts suggest strongly that with the advent of the Biden Administration, NLRB staff embarked on a hunt for pro-management decisions to undo. What they found here was the thinnest of gruel: Emanuel's investment in a fund that owns $33 *billion* in shares of

10

companies across the energy sector, which unbeknownst to him included ExxonMobil stock, and where it is unknown to anyone what percentage of that fund's stock (and thus Emanuel's holding) was ExxonMobil. Armed with that "knowledge," the new Democratic majority vacated decisions for ExxonMobil and four other employers, then after waiting a year – past the point where the two disinterested Members (or any two Republicans) could re-decide this case – issued a new decision against ExxonMobil.

If not vacated, the panel opinion will open a Pandora's box in Federal labor law, given the unique statutory provisions governing the finality of NLRB decisions. Under 29 U.S.C. 160(d) the Board may vacate its decision at any time before the record is filed in a reviewing circuit court of appeals, and 29 U.S.C. 160(f) places no time limit on such petitions. The panel opinion thus will become a roadmap to strategic conduct by parties and/or the NLRB, in any unappealed case after political control of the Board changes. The new majority and/or staff will be incentivized to scour the books for unappealed decisions issued under the former regime, then shred each – with or without a disqualifying financial or familial conflict or other purported

justification – "in such manner as it shall deem proper," 29 USC 160(d), and re-decide the case, with the result it wants.

Those seek-and-destroy missions could reach back years, decades or even *centuries* for cases, so long as no circuit-court record filing has occurred. The panel opinion will haunt future generations of unions and employers alike with a perpetually unsettled labor-law landscape, forever vulnerable to the shifting winds of political control. No unappealed Board precedent will be safe from being reopened and redecided by a subsequent Board with a majority of the other party. And though that gate will be rusty, noisy and ugly, it will swing both ways: Board decisions will remain perpetually subject to vacatur for any reason a subsequent Board or its staff can dredge up – or no reason at all. This volatility risk will be exacerbated if Presidential authority to remove Board members is recognized.[4]

Excessive politicization already hinders the Board's effectiveness. Brudney, *Isolated and Politicized: The NLRB's Uncertain Future*, 26 Comp. Lab. L. & Policy J. 221, 250 (Winter, 2005) ("[t]he Board's overtly

---

[4] *See Harris v. Bessent*, 2025 U.S. App. LEXIS 8151 (D.C. Cir. 2025), *stay granted sub. nom.*, *Wilcox v. Trump*, __ U.S. __, 2025 U.S. LEXIS 1453 (Apr. 9, 2025) (pending).

partisan composition has invited both labor and management litigants to show less respect for its prior decisions"), citing Dolin, *Estreicher Urges Reforms to Address NLRB "Policy Oscillation*," ABA Labor and Employment Law 2 (Spring 2005) (seemingly partisan reversals of precedent undermine respect for NLRB). The panel opinion will worsen that.

Further, as word of the published opinion spreads, its blessing of the Board's machinations will encourage prevailing parties to conjure up the flimsiest of reasons to petition circuit courts for review, so as to trigger the § 10(d) cutoff. Certain parties and firms (not involved here) already petition for review in Board cases even where they win, citing some trivial item of denied relief, to control venue. That trickle of meritless petitions easily could become a flood in this and other circuit courts as parties seek to have the record filed, and prevent the skullduggery seen here.

"[O]urs is a government of laws, not men." *Branum v. Commissioner*, 17 F.3d 805, 812 (5th Cir. 1994). When that ceases – when the "law" changes simply because the individuals making the legal rulings have changed – the result is turmoil and endless conflict.

The NLRB through its politically suspect machinations has created that state of affairs, and the panel opinion has blessed it. This Court should revisit it *en banc*.

## B.    The opinion contravenes *Williams*.

In *Williams*, the Supreme Court held that an undue risk of bias for one member of a multi-member adjudicative body (the Pennsylvania Supreme Court) required his recusal and re-decision, even where the court's decision was unanimous and thus his vote was not outcome-determinative. The court further held that due process did not require entirely new decisionmakers, but was satisfied by the remaining judges re-deciding the case. "*Allowing an appellate panel to reconsider a case without the participation of the interested member will permit judges to probe lines of analysis or engage in discussions they may have felt constrained to avoid in the first deliberation.*" *Williams*, 579 U.S. at 16 (emphasis added).

The panel rejected ExxonMobil's argument that under *Williams*, the two non-conflicted Members from the 2020 Decision and Order simply should have redecided it. Opinion, pg. 16. But that is precisely what *Williams* involved. Under it, the Board's new Democratic majority

in August 2022 should have let Ring and Kaplan re-decide the matter –
not submit the case for re-decision by an entirely new panel it
controlled.

## II. The en banc Court should clarify and apply *Tesla* so ExxonMobil's factual, non-coercive speech receives Constitutional protection.

The opinion also presents a First Amendment issue warranting *en banc* review under Fed. R. App. P. 40(b)(2)(A), (C) and (D).

First, it contravenes the plurality opinion in *Tesla, Inc. v. NLRB*,
120 F.4th 433 (5th Cir. 2024) (en banc). There, the NLRB sanctioned as
unfair labor practices various Elon Musk tweets, including ones that –
like Giglio's comment – merely made a factual observation about the
effects on benefits of unionizing:

> Nothing stopping Tesla team at our car plant from voting
> union. Could do so tmrw if they wanted. But why pay union
> dues & give up stock options for nothing? Our safety record
> is 2X better than when plant was UAW & everybody already
> gets healthcare. [*Tesla*, 120 F.4th at 436) (plurality opinion)
> (quoting tweet)].

When another Twitter user asked Musk whether he was threatening
workers with the loss of benefits for unionizing, Musk observed that
"'UAW does not have individual stock ownership as part of the
compensation at any other company,' and as such, Tesla employees

15

would lose stock options if they unionized because of UAW's policy." *Id.* at 436-437.

Assuming without deciding that Musk violated the NLRA, the plurality nonetheless found his tweets constitutionally protected and vacated the Board's order for their deletion. *Id.* at 438-439 ("[w]e hold that Musk's tweets are constitutionally protected speech…."). The plurality also cited *FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 126 (3d Cir. 2022) (vacating NLRB's finding of tweet as unfair labor practice and holding that when "protecting employees' statutory labor rights, neither we, nor the Board, can violate an employer's right to free speech under the First Amendment"). 120 F.4th at 439.

ExxonMobil is entitled to the same constitutional protection for Giglio's truthful remark. Just as Musk tweeted the factual observation that employees joining the UAW would forgo stock options, Giglio made the utterly true remark that ExxonMobil employees outside the bargaining unit enjoy eight weeks' PPTO. This Court cannot find Musk's tweets constitutionally protected, while at the same time allow the NLRB to penalize ExxonMobil – especially in a do-over issued under

politically charged circumstances, after it initially exonerated the statement.

*Tesla* was issued only days before the oral argument here, and thus was not briefed. With Judge Haynes joining only its judgment and Judge Ho recused, its lead opinion was a plurality, not a majority, and the panelists here all dissented. 120 F.4th at 441-458. But it makes the powerful point that an employer's truthful observations about the effects of unionization, even if assumed violative of the NLRA, "are constitutionally protected speech and do not fall into the categories of unprotected communication like obscenity and perjury." 120 F.4th at 439 (plurality opinion). This matter provides an excellent vehicle with which the *en banc* Court may clarify and amplify that important legal point.

Relatedly, the panel opinion conflicts with numerous decisions of the Supreme Court, this Court, and other circuits acknowledging that the NLRA "at an irreducible minimum protects the right of an employer to state its views, argument, or opinion, *and to make truthful statements of existing facts*," and that "[t]he First Amendment would permit no less." *Roper Corp. v. NLRB*, 712 F.2d 306, 311 (7th Cir. 1983) (emphasis

added), quoting *Dow Chemical Co. v. NLRB*, 660 F.2d 637, 644 (5th Cir. 1981) and citing 29 U.S.C. 158(c). This Court and others long have viewed that provision as "simply a recognition that an employer has a First Amendment right to communicate his views to his employees." *Roper Corp.*, 712 F.2d at 311, citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969), *Charge Card Ass'n v. NLRB*, 653 F.2d 272, 273 (6th Cir. 1981), *NLRB v. Carilli*, 648 F.2d 1206, 1212 (9th Cir. 1981), and *NLRB v. Proler Int'l Corp.*, 635 F.2d 351, 355 (5th Cir. 1981).

Yet the panel opinion affirms an unfair labor practice finding against ExxonMobil based on a single comment, made with evident sarcasm at the end of one of 23 contentious bargaining sessions, that everyone agrees was truthful and the union literally laughed off. In support it cites a 65-year-old decision that no appellate decision of any court appears to have cited for that point, and which this Court previously had not cited at all since 1982. Opinion, pg. 21, citing *NLRB v. Herman Sausage Co.*, 275 F.2d 229, 233-234 (5th Cir. 1960).

Labor negotiations "are a breed unto themselves. They are rough and tumble." *Chaney v. Kellogg Co.*, 1989 U.S. Dist. LEXIS 3989, *11 (E.D. Pa. 1989). As the 2020 Board unanimously found, no reasonable

employee hearing Giglio's comment would have thought it "a serious quid-pro-quo promise of benefits in exchange for their abandonment of unionization." ROA.3071.  Yet the opinion threatens to straitjacket future labor talks – negotiators going forward will read from anodyne prepared scripts, without engaging in the "annealing process" through which parties "hammer[] out" agreements at "give and take meetings." *Gulf States Mfrs., Inc. v. NLRB*, 579 F.2d 1298, 1325-26 (5th Cir. 1978) (citations omitted). Without irony, the Opinion notes "the parties fully litigated the overarching question of how employees would have understood Giglio's statement in the context of the parties' bargaining." Opinion, pg. 20 (cleaned up) (quoting ALJ). But the vacated 2020 Decision and Order recognized that too, and found the remark was at most an "inartful comment," not unlawful. ROA.3070-71 & fns. 15 & 11).

## <u>CONCLUSION</u>

ExxonMobil asks this Court to vacate the March 12, 2025 Opinion and rehear this matter *en banc*.

Respectfully submitted,

JACKSON LEWIS P.C.

By: <u>/s/ Daniel D. Schudroff</u>
Daniel D. Schudroff
666 Third Avenue
29th Floor
New York, New York 10017
(212) 545-4000
daniel.schudroff@jacksonlewis.com

and

THE SMITH APPELLATE LAW FIRM

By: <u>/s/ Michael F. Smith</u>
Michael F. Smith
1717 Pennsylvania Ave. N.W.
Suite 1025
Washington, D.C. 20006
(202) 454-2860
smith@smithpllc.com

*Counsel for Petitioner/Cross-Respondent ExxonMobil Research & Engineering Co.*

April 28, 2025

## <u>CERTIFICATE OF SERVICE</u>

This Petition was served upon counsel for Respondent/Cross-Petitioner by notice of electronic filing with the Fifth Circuit CM/ECF system.

<u>/s/ Michael F. Smith</u>

## CERTIFICATE OF COMPLIANCE

      1.    This Petition complies with the word limit of Fed. R. App. P. 40(d)(3)(A) and Fifth Circuit Rule 40.2.5 because, excluding the parts of the Petition exempted by Fed. R. App. P. 32(f), it contains 3,865 words.

      2.    This Petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in 14-point Century Schoolbook, a proportionally spaced font with serifs, using Microsoft Word for Microsoft 365 MSO.

/s/ Michael F. Smith

*Co-counsel for Petitioner/*
*Cross-Respondent ExxonMobil*
*Research & Engineering Co.*

Dated: April 28, 2025
4909-6524-0124, v. 1

**ADDENDUM**

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 12, 2025

Lyle W. Cayce
Clerk

No. 23-60495

ExxonMobil Research & Engineering Company, Incorporated, *now known as* ExxonMobil Technology and Engineering Company,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

Appeal from the National Labor Relations Board
Agency Nos. 22-CA-218903,
22-CA-223073, 22-CA-232016

Before Richman, Graves, and Ramirez, *Circuit Judges*.

James E. Graves Jr., *Circuit Judge*.

ExxonMobil Technology and Engineering Company ("Exxon") petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board"), finding it liable for unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The petition challenges not only the NLRB's substantive findings, but also, the vacatur of an earlier decision due to the participation of a conflicted Board member. Because we find that the Board's vacatur did not constitute an abuse of

No. 23-60495

discretion, and conclude that the Board's substantive conclusions are supported by substantial evidence, we DENY the petition for review and GRANT the NLRB's cross-petition for enforcement of its order.

## I.

Petitioner Exxon is a multinational oil and gas corporation headquartered in Texas. It operates a research facility, located in Annandale, New Jersey, that is the subject of this appeal. Approximately 165 employees at this facility are represented by the Independent Laboratory Employees Union (the "Union"). The Union has represented this bargaining unit, which primarily consists of research technicians, since the early 1940s.

A collective bargaining agreement ("CBA") that governed labor relations between Exxon and the Union expired in May 2018. In the years preceding the CBA's expiry, the parties squabbled over the company's personal time off ("PTO") policies. For example, in May 2016, the Union filed a grievance alleging that an Exxon supervisor denied an employee's PTO request in retaliation for an earlier grievance. The parties settled the matter in August 2016. Shortly thereafter, Exxon barred its supervisors from considering PTO requests, citing the possibility of inconsistent treatment. In a November 2016 grievance, the Union alleged that Exxon's PTO policy was revised in retaliation for its filing of the May 2016 grievance. The NLRB declined to pursue this allegation.

The parties began negotiating a successor labor agreement on May 7, 2018. Exxon designated manager Russell Giglio as its lead negotiator, while the Union appointed its President, Michael Myers, as its representative. Giglio, Myers, and their respective teams engaged in negotiations over 23 bargaining sessions, and reached agreement on many items. This appeal concerns negotiations over two residual issues: whether Exxon would restore the prior policy that allowed supervisors to review PTO requests

("supervisor PTO review"), and whether Union members could receive eight weeks of paid parental leave.

From the outset of negotiations, the Union made clear that it desired the restoration of supervisor PTO review. It thus offered a proposal that outlined various categories of requests (*i.e.*, "emergency," "medical," and "discretionary"), capped each category at a maximum number of hours, and delineated examples of various requests that fell within each category. Over the course of negotiations, the Union pared down its proposal to make it more palatable for Exxon. At one point, for example, the Union eliminated a separate "medical" category of requests and subsumed it entirely within a category of "discretionary" decisions.

But during the fifteenth negotiation session, on July 8, Giglio disclosed that the Union's proposal was a nonstarter for two connected reasons. First, Exxon viewed supervisors wielding discretionary authority as a recipe for "inconsistencies." Second, any inconsistencies would be used by the Union's "leadership team" to "grieve", "file [unfair labor practice allegations]," and "file lawsuits."

Giglio reiterated these objections on at least two other occasions. During a sidebar conversation[1] on July 9, Giglio informed Myers that Exxon was uninterested in restoring supervisor PTO review "because of the Union's filing of the [unfair labor practices grievance] in 2016 and it's [sic] aggressive actions." And during a September 4 bargaining session, Giglio

---

[1] A "sidebar" conversation, in the bargaining context, is a separate meeting where individual members from negotiating teams bargain privately. Comments made during a sidebar conversation may be used by the Board in determining whether an unfair labor practice transpired. *See, e.g., In Re Matanuska Elec. Ass'n, Inc.*, 337 NLRB 680, 683 (2002) (NLRB adopting an ALJ's finding that "[w]hether formal or sidebar, statements of position and declarations of movement on important issues must all be considered when evaluating whether there is a likelihood of reaching an agreement.").

conceded that while Exxon previously had an "unwritten process" allowing supervisors to grant PTO requests, the practice ended when the Union "brought an unfair labor practice allegation trying [to] formalize" the policy. Giglio summarized, "[T]hat gravy train has now moved on because we have to defend ourselves." After Myers confronted Giglio on what he meant exactly, Giglio contested that "the catalyst" for the frosty relationship between Exxon and the Union was Myers assuming the role of Union President in 2014.

A second area of dispute arose over Exxon's paid parental leave policy ("PPTO"). In November 2017, Exxon announced it would provide eight weeks of PPTO to employees who were not represented by a labor union. The Union sought to extend this benefit to its members. But for at least the first four days of negotiations, Exxon declined to address the Union's request. On the fifth day, May 24, Giglio postulated that the request was not "an offer" because the Union failed to provide any specific concessions in exchange for eight weeks of PPTO. Myers countered that the entirety of the negotiations constituted a "complete package."

Eventually, on or around the fifteenth bargaining session, Myers presented a tit-for-tat proposal: in exchange for eight weeks of PPTO, the Union was willing to forego a $5,000 per-employee ratification bonus. Giglio skeptically responded, "Do you really think 144 of those people [referring to the Union's membership] would want PPTO versus $5,000 up front?" Myers confirmed that was the Union's proposal.

During the next day's bargaining session, Myers pressed Giglio on what it would "take to get eight weeks of PPTO." Giglio replied, "Walk away from the bargaining agreement." When asked to clarify his response, Giglio stated that employees who were not represented "would have eight weeks of PPTO." The Union's representatives again asked what it would

No. 23-60495

"realistically take" to receive PPTO. Giglio demurred, stating that Exxon had already offered an "incredible and unprecedented offer" and that he "[couldn't] answer" what concessions were necessary. Later that day, during a sidebar conversation, Giglio again suggested that employees could "go without a union" if they desired a PPTO benefit.[2]

The Union filed unfair labor practice charges against Exxon, and the NLRB's General Counsel subsequently issued an unfair labor practice complaint regarding Exxon's conduct during the 2018 CBA negotiations. After holding an evidentiary hearing, an administrative law judge ("ALJ") issued a recommended decision finding that Exxon had violated the National Labor Relations Act by (1) refusing to bargain in good faith on the supervisor PTO review issue, (2) conveying to employees that it refused to bargain on the supervisor PTO review issue in retaliation for the Union's past grievances, and (3) suggesting to employees that they would receive eight weeks of PPTO in exchange for decertifying the union. On September 28, 2020, the Board, consisting of then-Chair John Ring and then-Members William Emanuel and Marvin Kaplan, issued a decision (the "2020

---

[2] In its opening brief, Exxon denies that this sidebar conversation occurred, and points to portions of Giglio's testimony that purportedly rebut Myers' recollection. But the Board adopted the ALJ's finding that "Giglio's denial that he made the comment during the side bar was not credible given his subsequent comments on the record." 372 NLRB No. 138 at 21 n.13 (Appendix, ALJ Findings of Fact). And we are bound by the ALJ's credibility determinations "unless one of the following factors exists: (1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his choice." *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996) (citing *NLRB v. Motorola, Inc.*, 991 F.2d 278, 282 (5th Cir. 1993)); *see also NLRB v. Ryder/P.I.E. Nationwide, Inc.*, 810 F.2d 502, 507 (5th Cir. 1987) (this court "must accord great deference to the credibility determinations of the ALJ, and the Board"). Exxon's challenge falls short of the magnitude necessary to disturb the Board's evidentiary conclusions regarding this piece of evidence.

No. 23-60495

Decision") that reversed the ALJ's findings and dismissed the NLRB's Complaint. 370 NLRB No. 23 (2020).

Several months after the 2020 Decision, Member Emanuel submitted a financial disclosure report that generated concerns related to potential conflicts of interest. In May 2021, at the request of the agency's Designated Agency Ethics Official, the NLRB's independent Inspector General opened an investigation into Member Emanuel's financial holdings. On August 21, 2021, the Inspector General issued a report concluding that Member Emanuel had improperly participated in multiple NLRB proceedings, including the one involving Exxon and the Union, in violation of 18 U.S.C. § 208(a). In particular, the Inspector General found that "Member Emanuel's position that he lacked knowledge of the conflicting financial interest[s] [was] without merit." The Designated Agency Ethics Official reviewed the Inspector General's report and recommended that Member Emanuel should have been disqualified from the proceedings that culminated in the 2020 Decision.

On January 7, 2022, the Board issued a Notice to Show Cause requesting briefing on whether the 2020 Decision was subject to vacatur in light of Member Emanuel's conflicted participation in the case.[3] After receiving briefing, on August 19, 2022, a panel of the Board (Chair McFerran and Member Wilcox as the majority; Member Ring dissenting) vacated the 2020 Decision and referred the case for adjudication by a new Board panel. 371 NLRB No. 128 (2022). Specifically, the Board concluded that vacatur

---

[3] When the Notice to Show Cause was issued, original panel members Ring and Kaplan were joined by new Board colleagues Gwynne Wilcox, Lauren McFerran, and David Prouty. McFerran replaced Ring as Chair.

was necessary to preserve public confidence in the integrity and impartiality of the NLRB's adjudicative process. *Id* at 2.

Subsequently, on August 25, 2023, the Board issued a new decision and order (the "2023 Decision") that affirmed the ALJ's findings regarding Exxon's refusal to bargain in good faith on the supervisor PTO review item, and refusal to bargain on the issue in retaliation for the Union's past grievances. 372 NLRB No. 138 at 8–9 (Aug. 25, 2023). The Board also concluded that Exxon unlawfully informed employees "that, at least with respect to PPTO, they were better off without being represented by the Union." *Id.* at 10.[4] The 2023 Decision ordered two remedies: first, Exxon was to cease and desist from these specific unfair labor practices, and second, Exxon was required to post a remedial notice at the New Jersey facility where Union employees work. *Id.* at 15–16.

Exxon did not seek rehearing of the 2023 Decision. It instead filed a petition for review of the Board's actions. The NLRB subsequently filed a cross-petition for enforcement of the 2023 Decision.

## II.

We have jurisdiction over Exxon's petition for review pursuant to 29 U.S.C. § 160(f), and the NLRB's cross-petition for enforcement pursuant to 29 U.S.C. § 160(e). But our review "of NLRB decisions and orders is limited and deferential." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018). The Board's procedural decisions, such as those concerning vacatur and reconsideration, are reviewed for abuse of discretion. *Renew Home Health v. NLRB*, 95 F.4th 231, 239 (5th Cir. 2024); *see, e.g., NLRB v.*

---

[4] This charge differs from the ALJ's original finding: that Exxon "offered PPTO benefits to employees on the condition that they give up or decertify the Union." This issue will be discussed later in the opinion.

*U.S.A. Polymer Corp.*, 272 F.3d 289, 296 (5th Cir. 2001) (reviewing denial of a motion for reconsideration for abuse of discretion); *NLRB v. Con-Pac, Inc.*, 509 F.2d 270, 272 (5th Cir. 1975) (concluding that "dispens[ing] with a hearing" was "not an abuse of discretion").

As for substantive rulings, the parties agree that the Board's factual findings are reviewed "under a substantial evidence standard," while its legal conclusions are reviewed de novo. *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008). The factual standard is a deferential bar: substantial evidence "is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). Even if this court could "justifiably [make] a different choice had the matter been before it de novo," it cannot "displace the Board's choice between two fairly conflicting views" of the evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

## A.

Exxon focuses the majority of its argument on alleged administrative, procedural, and statutory violations that resulted from the Board's vacatur of the 2020 Decision. Specifically, the company avers that the NLRB lacked the authority to vacate the 2020 Decision, and alternatively, that even if the Board had vacatur authority, exercising it was an improper remedy for Member Emanuel's participation in the 2020 Decision.

## 1.

29 U.S.C. § 160(d) ("Section 10(d)" of the National Labor Relations Act) allows the NLRB to, at "any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it." The NLRB justified its vacatur of

the 2020 Decision through the exercise of its Section 10(d) authority.[5]  371 NLRB No. 128 at 2.  The statute's plain text offers only one temporal limit on this authority: the NLRB may not modify or set aside its orders once "the record in a case [is] filed in a court." 29 U.S.C. § 160(d).

Exxon first contests that the Board "improperly" used its Section 10(d) authority.  It points to the following line from *In re NLRB*, 304 U.S. 486 (1938): Section 10(d) affords the Board "an opportunity to correct errors in a court to consider new evidence which would render the order inadequate or unjust." *Id.* at 492.  Exxon construes this quote as a limitation on Section 10(d): under its reading, the NLRB may only exercise the power "to correct mistakes, consider newly-discovered evidence, and conform orders based on subsequent changes in law."

But the very events that transpired in *In re NLRB* undermine Exxon's narrow reading.  The case concerned a 1938 policy change, enacted three years after the NLRB's creation, that allowed parties to submit briefs and request oral argument.  304 U.S. at 489.  To enforce this policy change in all of its cases, the NLRB sought to vacate its orders in "cases already decided," "restore the causes to its docket," and "reconsider and redetermine them" after providing parties with an opportunity to submit briefs and be heard.  *Id.*  These sweeping procedural actions would have been unlawful under Exxon's reading of the case, as the Board's policy change neither corrected a mistake, nor contemplated newly discovered evidence,

---

[5] Exxon remarks that 18 U.S.C. § 208(a), the statute that the NLRB concluded Member Emanuel violated, is a criminal statute that the Board is incapable of enforcing. But the NLRB's vacatur decision was grounded in its broad statutory authority to reconsider decisions; it simply referenced 18 U.S.C. § 208(a) as the violation that warranted Member Emanuel's disqualification.

nor conformed to subsequent changes in law. Yet the Supreme Court upheld the NLRB's authority to execute these purely procedural actions. *Id.*

At bottom, the plain text of Section 10(d) grants the NLRB broad authority to modify or set aside its orders. And the only textual limitation, that the authority disappears once "the record in a case [is] filed in a court," is not applicable here. 29 U.S.C. § 160(d). Exxon's attempt to transform dicta from *In re NLRB* into limitations on the Board's authority cannot be squared against by the very facts underlying the decision. Accordingly, the NLRB's vacatur of the 2020 Decision was, at minimum, based on a legitimate exercise of its statutory authority to reconsider or set aside its prior rulings.

**2.**

Exxon also contends that 28 U.S.C. § 455, titled "Disqualification of justice, judge, or magistrate judge," enumerates the principles that should have dictated the NLRB's response to the ethics concerns. But the judicial disqualification statute does not bind the NLRB's actions for at least two reasons. First, the provisions apply to "any justice, judge, or magistrate judge of the United States"—in other words, Article I or III judicial positions. 28 U.S.C. § 455. Members of the National Labor Relations Board are Article II appointees. 29 U.S.C. § 153(a). Second, the statute outlines circumstances that warrant the disqualification of a judicial official. 28 U.S.C. § 455. This case presents a different, and derivative, question: how an agency proceeds once it determines that a panel member should have refrained from participating in a since-issued adjudicative decision.

As Exxon avers, prior Board members have relied on 28 U.S.C. § 455 to guide recusal determinations. In both *Overnite Transp. Co.*, 329 NLRB 990 (1999), and *Cedars-Sinai Med. Ctr.*, 224 NLRB 626 (1976), individual NLRB members referenced the judicial disqualification statute's provisions

No. 23-60495

while explaining their respective decisions to remain on a case. But solo opinions are not binding upon the NLRB, and in any event, the cited concurrences concerned whether a Board member should have continued participating in a case's disposition. To the extent that Exxon believes that Member Emanuel's conflict did not warrant disqualification, the Board "unanimous[ly]" concluded otherwise. 371 NLRB No. 128 at 2.

Even if the judicial disqualification statute bound the NLRB's actions, Exxon's arguments are unavailing for two additional reasons. First, as to the statute itself, Member Emanuel's disqualification would be justified under 28 U.S.C. § 455(a), which requires that a judge be disqualified from "any proceeding in which his impartiality might reasonably be questioned." And second, the question of whether a member ought to be disqualified is distinct from how to remedy a proceeding that included a disqualified member. As to the latter question, the Supreme Court has explained that 28 U.S.C. § 455 "neither prescribes nor prohibits any particular remedy for a violation of that duty." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862 (1988). It is thus difficult to conclude that the NLRB abused its discretion by selecting a valid remedy (vacating the 2020 Decision and rehearing the case) instead of Exxon's preferred option (retaining the original panel opinion).

**3.**

Next, Exxon invokes res judicata, and theorizes that the NLRB's delay in vacating the 2020 Decision was "inappropriate." But res judicata is only implicated when a second, later suit involves the same parties and causes of action as a first, final suit. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979). This case, by contrast, involves just one decision that was vacated—removing the finality of that decision—and then redecided.

No. 23-60495

One of Exxon's related arguments fares better: even if the NLRB had the authority to vacate prior decisions, it ought to have done so expeditiously in this case. The company references a pair of out-of-circuit cases for interconnected propositions: (1) reconsideration should "occur[] within a reasonable time after the first decision," *Belville Mining Co. v. United States*, 999 F.2d 989, 997 (6th Cir. 1993), and (2) "absent unusual circumstances, the time period will be measured in weeks, not years." *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977).

But neither case fits the present dispute. The *Belville Mining* quote is expressly conditioned on an agency's exercise of its *inherent* authority: "[T]he general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision." 999 F.2d at 997 (citation omitted). *Mazaleski* holds the same distinction. 562 U.S. at 720 ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."). In contrast, the NLRB exercised its *statutory* Section 10(d) authority to vacate the 2020 Decision. 371 NLRB No. 128 at 2.

And even if a hypothetical test created by *Mazaleski* and *Belville Mining* applied to this case, the NLRB would have a strong argument that its delay was reasonable. It is undisputed that 16 months elapsed between the issuances of the 2020 Decision and the January 2022 Order to Show Cause. But extenuating circumstances explain the delay: the NLRB was unable to confirm the existence of Member Emanuel's conflict until, at earliest, August 2021, when the Board's independent Inspector General issued a report concluding such. The NLRB issued its Notice to Show Cause approximately five months after that report—a period of time that is arguably reasonable, given competing agency demands, and, in any event, a duration

No. 23-60495

that, consistent with *Mazaleski*, is measured "in weeks, not years." 562 F.2d at 720.[6]

Exxon also references various factors that were compiled in a law review Note penned by now-Ninth Circuit Judge Daniel Bress. In the Note, Bress surveyed federal cases that evaluated an agency's authority to reconsider its decisions. He concluded that the following seven factors were employed, though not necessarily together:

> (1) the complexity of the decision; (2) whether the decision was based on fact or law; (3) whether the agency acted according to its general procedures for review; (4) whether parties had relied upon the initial decision; (5) whether the agency acted in bad faith by advancing a pretextual explanation to justify reconsideration; (6) whether the agency provided notice of its intent to reconsider the initial decision; and (7) the probable impact of an erroneous agency decision absent reconsideration.

Daniel Bress, *Administrative Reconsideration*, 91 Va. L. Rev. 1737, 1761–62 (2005). But reviewing the entirety of the Note reveals three distinguishing points. First, Bress acknowledged that there is substantial variance in what constitutes a reasonable period for reconsideration. *Id.* at 1763–64 ("Oddly, two years has held to be both reasonable and unreasonable. And while eleven months, one year, sixteen months, and three years have been held

---

[6] Exxon vaguely references a different "motion to remand" regarding Member Emanuel's financial conflicts that the NLRB filed in a D.C. Circuit appeal on October 26, 2021—eight weeks before it filed the Notice to Show Cause in this case. But the comparison is akin to apples and oranges: the extent and degree of Member Emanuel's financial conflicts in the D.C. Circuit case are not in the record. And in any event, an eight-week difference is too short to attribute the nefarious motive Exxon suggests—especially considering that the NLRB ultimately issued a Notice to Show Cause in the D.C. Circuit case *six months after* the show cause order in this dispute. *Dist. Hosp. Partners, L.P.*, 372 NLRB No. 109 (July 25, 2023) at 1 ("On July 14, 2022, the National Labor Relations Board issued a Notice to Show Cause in this proceeding.").

unreasonable, four and a half years has been deemed acceptable."). Second, the piece does not analyze financial conflicts of interest as a justification for agency reconsideration. And third, the factors are presented in a distinguishable context: "where federal courts have been unwilling to adhere to the default presumption that administrative agencies have the inherent power to reconsider." *Id.* at 1756. As mentioned earlier, the Board's vacatur decision was premised on its *statutory* Section 10(d) authority. These points, coupled with the non-binding nature of the piece itself, greatly diminish its persuasive value in resolving this matter.

### 4.

Exxon separately argues that even if Member Emanuel had a disqualifying conflict of interest, vacatur was not warranted because he was not dispositive to forming a majority opinion. Otherwise stated, Exxon posits that the NLRB should have just let the 2020 Decision stand as a 2-0 majority opinion with one recused panel member. The Supreme Court, however, has rejected this back-of-the-napkin approach as ethically improper and procedurally insufficient.

Specifically, in *Williams v. Pennsylvania*, the Supreme Court concluded that Pennsylvania Supreme Court Chief Justice Ronald Castille should have recused himself from participating in a capital appeal after previously authorizing prosecutors to seek the death penalty against the petitioner while serving as District Attorney. 579 U.S. 1, 14 (2016). Notably, the Pennsylvania Supreme Court's decision was a 6-0 unanimous dismissal, meaning that Castille's vote was not dispositive. But the *Williams* majority had "little trouble" concluding that Castille's participation was "a structural error even if the judge in question did not cast a deciding vote." *Id.* Two principles were central to this conclusion. First, because judicial deliberations are considered confidential, inquiring as to whether a conflicted

judge affected a panel (and if so, to what degree) is neither practical nor productive. *Id.* at 14–15. Second, "[b]oth the appearance and reality of impartial justice are necessary to the public legitimacy" of the court's work and the rule of law. *Id.* at 15–16.

These twin principles dispose of Exxon's arguments on this point. The company's pronouncement that if Members Ring or Kaplan "had any concern about whether Member Emanuel's impacted *their* decision making in the instant case, they would have so stated in the Notice to Show Cause or an ensuing Decision Order," is a speculative assumption made with incomplete information about confidential deliberations. Exxon similarly contends that vacatur was unnecessary because Member Emanuel was unaware of any conflict, and thus could not have engaged in overt and unfair conduct. Notwithstanding the fact that the independent Inspector General concluded that Member Emanuel's purported obliviousness was "without merit," the twin principles outlined in *Williams*—the impracticality of measuring a conflicted judge's influence and the need to maintain at least an appearance of impartiality—counsel against this position. 579 U.S. at 15–16. And while Exxon references the "harmless error" standard often employed to adjudicate concerns related to the judicial disqualification statute, the principle, as mentioned above, "neither proscribes nor prohibits any particular remedy" to redress a judge's disqualification from a case. *Liljeberg*, 486 U.S. at 862. For the reasons explained throughout this opinion, the NLRB was well within its discretion to vacate the 2020 Decision and rehear the case with a newly construed panel.

Exxon also points to *Hodosh v. Block Drug Co.*, which rejected the "erroneous assumption that a unanimous decision must be vacated when one member of the panel learns of a basis for his disqualification." 790 F.2d 880, 881–82 (Fed. Cir. 1986). But *Hodosh* and similar Federal Circuit cases (such as *Maier v. Orr*, 758 F.2d 1578, 1583 (Fed. Cir. 1985)) do not mandate that

panel decisions remain unchanged despite the participation of a conflicted member. Nor do these cases compel the suggestion Exxon posited at oral argument: that a reconstituted panel should have included the non-conflicted Board members that participated in the original decision.

Lastly, Exxon claims that *Williams* is "entirely inapposite" because Chief Justice Castille's bias was "unequivocally apparent, unlike the present case where Member Emanuel did not even know of the purported financial conflict of interest." But *Williams* turned not on the *subjective* knowledge of a conflict, but rather, the *objective* appearance of bias that exists through the presence of an ethical conflict. 579 U.S. at 16 (identifying the "objective risk of actual bias on the part of a judge"). The Board was accordingly well within its discretion to conclude that vacatur was necessary to promote public confidence and preserve the integrity and impartiality—or at least the appearance of such—of its adjudicative processes.

At bottom, the Board's procedural decisions are reviewed for abuse of discretion. *Renew Home Health v. NLRB.*, 95 F.4th 231, 239 (5th Cir. 2024). Despite Exxon's repeated references to the judicial disqualification statute, the NLRB acted within its jurisdiction when it employed its Section 10(d) authority. And the Board's decision to vacate the 2020 Decision is defensible in multiple respects: it promotes public confidence in the agency's ability to issue decisions that are not tainted by ethical or financial conflicts; creates NLRB precedent that vacatur is the proper remedy when a panel member is found to have disqualifying conflicts of interest; and protects the agency from potential legal liability related to unethical decision-making. Each of these factors alone would justify vacatur of the 2020 Decision; combined, they provide a comprehensive rationale that easily clears the abuse of discretion standard that circumscribes our review.

No. 23-60495

## B.

Separately, Exxon challenges the NLRB's two substantive findings related to its negotiations on the supervisor PTO review issue: that it refused to bargain on the issue in good faith, and it refused to bargain in retaliation for the Union's previous grievances. The Board based these conclusions on three of Giglio's statements: his July 8 remark that the Union's proposal was a nonstarter due to "inconsistencies" and the Union's use of inconsistencies to "grieve" and "file lawsuits"; his July 9 comment, made during a sidebar conversation, that Exxon was uninterested in negotiating on the issue "because of the Union's filing of the [unfair labor practices grievance]"; and his September 4 explanation that the company removed the previous supervisor PTO review policy (self-described as a "gravy train") because "[Exxon has] to defend ourselves."

Exxon raises two arguments in opposition to the Board's conclusions. First, it suggests that its position on supervisor PTO review was justified because of "pitfalls of inconsistency" associated with enforcement. But the record lacks any specificity on what "pitfalls" could occur. It merely suggests that Exxon "simply did not trust each supervisor to administer [a PTO program] in a manner in which it would avoid challenges." This vague pronouncement does not answer (1) how the issue is nonunique, given that presumably, *someone* will have to decide whether to grant an employee's PTO request,[7] or (2) why the Union's proposal, which appeared to delineate how various requests fell within preset categories, would not at least limit possible inconsistencies.

---

[7] At oral argument, neither party was able to explain how Union members' PTO requests are currently addressed.

Furthermore, Giglio's comments constitute substantial evidence that Exxon had a superseding motive for rejecting the Union's supervisor PTO review proposals: inconsistencies would lead to labor grievances. Indeed, Giglio's July 9 and September 4 comments establish that the Union's grievance activity was a but-for cause of Exxon's refusal to negotiate on the supervisor PTO review issue. In the former comment, Giglio explicitly justified the company's refusal to negotiate by pointing to past grievances involving supervisor PTO review. And in the latter comment, Giglio admitted that Exxon eliminated the supervisor PTO review policy—self-described as a "gravy train"—because the company had "to defend [itself]," ostensibly from future Union grievances.

To give Exxon the benefit of the doubt, these two concerns can be distinct issues. The company could have been wary that a discretionary policy would lead to additional Union grievances, while also being concerned that reinstating supervisor PTO review would result in inconsistent treatment among different supervisors. But Giglio's comments subsume the latter concern within the former: Exxon was concerned about inconsistent treatment *because* such inconsistencies made the company vulnerable to lawful grievance activity. That causation link, formed by Giglio's remarks, pushed Exxon's position from permissible bargaining into unlawful retaliation for prior grievance activity. *See, e.g.*, *10 Ellicott Square Ct. Corp.*, 320 NLRB 762, 772 (1996) (finding a violation of the National Labor Relations Act when an employer "condition[ed] agreement on the terms of a collective-bargaining agreement, on the Union's withdrawing unfair labor practice charges"); *In Re Mesker Door, Inc.*, 357 NLRB 591, 597 (2011) (finding that threats of retaliation for employees that filed charges had a "likely long-term effect of deterring employees from filing future charges with the Board"), *overruled in part on other grounds by Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120 (Nov. 22, 2019).

Second, and separately, Exxon avers that it did bargain on the supervisor PTO review issue with the Union over multiple negotiation sessions; the parties were just unable to reach an agreement. But "merely meeting together or simply manifesting a willingness to talk does not discharge the federally imposed duty to bargain." *NLRB v. Big Three Indus., Inc.*, 497 F.2d 43, 46 (5th Cir. 1974). Instead, parties must "meet and negotiate in a certain frame of mind – to bargain in good faith." *Id.*

Exxon's conceded position on the supervisor PTO review issue crossed the line from hard bargaining into unlawful obstruction. The company expressly based its refusal to negotiate on (1) a prior grievance the Union had filed and (2) the Union's purported propensity to file unfair labor practice allegations. Both rationales directly implicate the Union's well-protected right to file labor grievances. And because of this hardline position, Exxon refused to contemplate an alternative that the Union proposed and tweaked to address the company's concerns. The record accordingly affords substantial evidence in support of two violations that the Board assessed concerning supervisor PTO review.

## C.

Exxon also challenges the NLRB's finding that it unlawfully made coercive statements relating to PPTO. The Board based its decision on two findings: first, Exxon's initial refusal to bargain on the PPTO issue, and second, Giglio's comment that an employee desiring PPTO could simply leave the union. Again, substantial evidence supports the NLRB's decision that Giglio's comments crossed the line into unlawful territory.

Exxon offers two responses to this charge—one procedural, one substantive. On procedure, Exxon accuses the Board of performing a bait-and-switch: while the ALJ initially concluded that Exxon "offered PPTO benefits to employees on the condition that they give up or decertify the

Union," the NLRB overturned that finding and instead pressed a different charge: that Giglio informed employees "that, at least with respect to PPTO, they were better off without being represented by the Union."

But the company's argument has two fatal defects. First, a petitioner seeking review of an NLRB decision is barred, absent "extraordinary circumstances," from raising an objection that was not at least first "urged" before the Board. 29 U.S.C. § 160(e). Indeed, when presented with this exact posture (an alleged procedural due process violation that resulted from the Board's actions), the Supreme Court expressly refused to address the issue because the party "failed to file a petition for reconsideration" before the NLRB. *Int'l Ladies' Garment Workers' Union, Upper S. Dep't, AFL-CIO v. Quality Mfg. Co.*, 420 U.S. 276, 281 n.3 (1975). The same is true here: Exxon failed to file a motion for reconsideration before seeking this court's review, and is accordingly barred from raising any new procedural objections absent an extenuating circumstance.

Second, the Board is allowed to "find and remedy a violation even in the absence of a specified allegation in the complaint" if two requirements are met: "the issue is closely connected to the subject matter of the complaint," and the issue "has been fully litigated." *Pergament United Sales*, 296 NLRB 333, 334 (1989). The requirements are satisfied here: the Board's new charge, that Exxon insinuated that Union employees were better off without the Union's representation, stems from the same nucleus of operative facts as the ALJ's original recommendation. And, as the NLRB contends, "the parties fully litigated the overarching question of how employees would have understood [Giglio's] statement in the context of the parties' bargaining." Exxon's claim accordingly does not rise to an error that warrants reversal.

No. 23-60495

Turning to substance, Exxon frames Giglio's remarks as "sarcasm" and "meaningless, frustrated remark[s]" made during one of over 20 bargaining sessions. But that isolated framing obscures important context. Even though the Union sought PPTO from the outset of negotiations, Exxon's representatives refused to discuss the topic for at least the first four negotiating sessions. During the fifth negotiating session, Giglio conveyed a desire for specific consideration in exchange for the benefit. Yet when presented with just that (an offer to forfeit the $5,000-per-employee ratification bonus in exchange for the eight weeks of PPTO), Giglio immediately questioned Myers' authority to make that offer. The implicated remarks, in turn, constituted Exxon's first substantive response to the Union's proposal—and it effectively amounted to, *those who desire the benefit can simply get it by leaving the Union.*[8]

Exxon is correct that Giglio's remarks were truthful: the company provided eight weeks of PPTO to non-represented employees, and so an individual employee desiring the benefit could receive it by leaving the union. But truthful statements, when subsumed in the specific context of negotiations, can be reasonably construed as encouragement to separate from a union. *See, e.g.*, *NLRB v. Herman Sausage Co.*, 275 F.2d 229, 233–34 (5th Cir. 1960) (concluding that a truthful remark that employees would get more pay because they would not need to pay union dues, constituted "union disparagement" because it would "become a reality only if . . . the employees

---

[8] Exxon claims that the Union's representatives testified that they did not understand Giglio's bargaining session remarks "to be serious." But this misconstrues the testimony: Myers testified that it would be "ridiculous" for *Giglio* to think that *Myers* was willing to "get rid of the union and not be the president in order to get PPTO." And while Union Vice President Thomas Fredriksen testified that he laughed at Giglio's comment because it was an "absurd response," he also confirmed his understanding of the comment: "that if [the Union] didn't have a collective bargaining agreement, [he] would receive PTO."

would withdraw from the union"). And the employees that Exxon was negotiating with could have objectively viewed Giglio's remarks as sincere, given that (1) he made a similar suggestion at least one additional time that day, and (2) "frustrated remark[s]," as Exxon frames them, can evince true motivations uncovered through intense negotiations.

At bottom, both Exxon and the Board have presented justifiable interpretations of Giglio's comments. But on appeal, the standard of review for factual interpretations is substantial evidence, and accordingly, our role is restricted to evaluating whether the Board's view of the facts is reasonable. We cannot "displace the Board's choice between two fairly conflicting views" of the evidence even if we could "justifiably [make] a different choice had the matter been before [us] de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Valmont line nuIndus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) (same). And the same standard applies to "plausible inferences [the NLRB] draws from the evidence." *NLRB v. Thermon Heat Tracing Serv., Inc.*, 143 F.3d 181, 185 (5th Cir. 1998). Thus, while Exxon raises colorable arguments challenging the Board's interpretation of Giglio's comments, the NLRB's better reading is supported by substantial evidence—foreclosing reversal on appellate review.

## IV.

For the reasons discussed above, we DENY Exxon's petition for review and GRANT the Board's cross-petition for enforcement.