# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
December 17, 2025
Lyle W. Cayce
Clerk

No. 23-60495

ExxonMobil Research & Engineering Company, Incorporated, *now known as* ExxonMobil Technology and Engineering Company,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

Appeal from the National Labor Relations Board
Agency Nos. 22-CA-218903,
22-CA-223073, 22-CA-232016

ON PETITION FOR REHEARING EN BANC

Before Richman, Graves, and Ramirez, *Circuit Judges*.

Per Curiam:

The petition for rehearing en banc is DENIED. At the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P. 40 and 5th Cir. R. 40).

In the en banc poll, four judges voted in favor of rehearing (Chief Judge Elrod, and Judges Jones, Smith, and Oldham), and thirteen judges voted against rehearing (Judges Stewart, Richman, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, Wilson, Douglas, and Ramirez).

James C. Ho, *Circuit Judge*, concurring in the denial of rehearing en banc:

I'm grateful to the dissenters for flagging this case for further review. Had I been on the panel, I'm sure I would've taken their approach. But the issue before us today is not how the three-judge panel should've decided this case, but whether all seventeen of us should now rehear it.

Our rules disfavor rehearing en banc. *See* Fed. R. App. Proc. 40(a); 5th Cir. R. 40.2.1. After all, it's a far greater tax on resources to litigate disputes before seventeen judges rather than three. *See* 5th Cir. R. 40.2.1 ("each request for en banc consideration must be studied by every active judge of the court and is a serious call on limited judicial resources").

Accordingly, members of our court have defended the denial of rehearing en banc on the ground that counsel failed to adequately present the issues before the three-judge panel. In *Siders v. City of Brandon*, 130 F.4th 188 (5th Cir. 2025), we denied rehearing en banc on the ground that the plaintiff brought her religious liberty claim under the Free Speech Clause, rather than the Free Exercise Clause. I dissented. I noted that religious expression is (obviously) protected by the Free Speech Clause, too.

My point is not to relitigate *Siders*. It's just to state that, if inadequate lawyering is a sufficient reason to refuse rehearing en banc, then that's what we should do here. Indeed, what was merely alleged in *Siders* is undisputed here: This petition features a First Amendment claim that the party never presented to the panel—suggesting the theory is either patently meritless or wrongly neglected by prior counsel.

I assume it's the latter, because prior counsel also forfeited over two-thirds of his oral argument time before the panel.

It seems obvious that counsel should litigate diligently before the three-judge panel, before insisting on the attention of all seventeen members of the court.

This isn't "punishment." *Post*, at 14. It's a principle. It's not punishment for your appeal to be decided "only" by three judges (indeed, that's what we do in the vast majority of our appeals). It's a principle that you should actually use the opportunity to litigate before those three judges, before asking for more.

If you can't even be bothered to use your time before three judges, it seems peculiar to demand more time from all seventeen of us. I wouldn't reward that behavior. And my unwillingness to reward it isn't punishment.

* * *

The regulatory about-face in this case reminds me that our court found a similar "surprise switcheroo" by another federal agency in *Wages and White Lion Investments, L.L.C. v. FDA*, 90 F.4th 357, 386 (5th Cir. 2024). I joined that majority opinion. The Supreme Court unanimously reversed. 604 U.S. 542 (2025). That's not to suggest that one group of judges was obviously right, and the other obviously wrong, but to make precisely the opposite point: Judges can disagree with one another in good faith.

Different judges can reach different judgments about when to rehear a case en banc. In *Neese v. Becerra*, 127 F.4th 601 (5th Cir. 2024), we denied rehearing en banc despite another dramatic regulatory "switcheroo"—this time, on the profoundly sensitive issue of transgender ideology, children, and the rights of doctors who disagree with elite medical opinion. I dissented in *Neese*, as I did in *Siders*.

It is my firm conviction that we should exercise our judicial discretion neutrally—not to favor commercial controversies over cultural ones.[1] So if *Siders* and *Neese* didn't warrant en banc review, then neither does this case.

[1] *See, e.g.*, *MCR Oil Tools, L.L.C. v. U.S. Dep't of Transp.*, 102 F.4th 326, 326 (5th Cir. 2024) (Ho, J., concurring) (citing *Woodlands Pride, Inc. v. Paxton*, No. 23-20480 (5th Cir.)); *Environment Tex. Citizen Lobby v. ExxonMobil Corp.*, 123 F.4th 309, 351–53 (5th Cir. 2024) (Ho, J., in support of dismissing rehearing en banc as improvidently granted).

Andrew S. Oldham, *Circuit Judge*, joined by Elrod, *Chief Judge*, and Jones and Smith, *Circuit Judges*, dissenting from the denial of rehearing en banc[1]:

The NLRB made a naked power grab, and it prioritized political gamesmanship over finality and repose. In doing so, it revealed many of the constitutional problems associated with so-called independent agencies. And it illustrated what happens when such agencies are allowed to operate unconstrained by presidential oversight and basic rule-of-law principles. I respectfully dissent from the decision not to rehear this case.

Modern administrative law rests on two fundamental propositions. First, we assume that administrative agencies exercise the President's executive power. The Constitution vests in the President 100% of "The executive Power." U.S. Const. art. II, § 1, cl. 1. He alone wields that power—unless he chooses to delegate it to one of his executive agencies. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020) ("The entire 'executive Power' belongs to the President alone.").

Second, and relatedly, we assume that administrative agencies are subject to presidential oversight in wielding the President's executive power. That hoary principle makes sense of our constitutional structure: Executive agencies operate "under the general administrative control of the President," so that he may achieve the "unitary and uniform execution of the laws which article 2 of the Constitution evidently contemplated in vesting general executive power in the President alone." *Myers v. United States*, 272 U.S. 52, 135 (1926). It also promotes democratic accountability so that "the chain of dependence [is] preserved; the lower officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President

[1] Chief Judge Elrod joins in all but Part II.C.

on the community. The chain of dependence therefore terminates in the supreme body, namely, in the people." 1 Annals of Cong. 518 (J. Madison). Only if agencies are "subject to [the President's] superintendence," THE FEDERALIST NO. 72, at 436 (Hamilton) (Clinton Rossiter ed., 1961), can the people "determine on whom the blame or the punishment of a pernicious measure . . . ought really to fall," THE FEDERALIST NO. 70 (Hamilton), supra, at 428.[2]

Independent agencies, or our "headless Fourth Branch," are different. *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 921 (1991) (Scalia, J., concurring in part and concurring in the judgment). "Unlike executive agencies supervised and directed by the President, independent agencies sit uncomfortably at the outer periphery of the Executive Branch." *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2517 (2025) (Kavanaugh, J., concurring). The defining characteristic of their independence is that Congress can limit the President's power to remove the leaders of

[2] The same reasoning undergirded Justice Scalia's now-infamous defense of *Chevron* deference. Deferring to agencies helped the executive branch respond to "direct political pressures" so that "continuing political accountability [was] assured." Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L. J. 511, 518 (1989). *See also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) (arguing that "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's" change in course.).

Of course, *Chevron* presented other problems—as even Justice Scalia emphasized later in his career. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109–11 (2015) (Scalia, J., concurring in the judgment) (discussing "judge-made doctrines of deference" inconsistent with "the original design of the APA"). Thankfully, the Supreme Court has since restored "the traditional understanding of the judicial function" by rejecting *Chevron* deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). But it remains true that "Presidential supervision and direction" is critical to situate executive agencies within our constitutional structure. *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2517 (2025) (Kavanaugh, J., concurring); *see also Kisor v. Wilkie*, 588 U.S. 558, 571–72 (2019).

independent agencies. *See Seila Law*, 591 U.S. at 216. That tenure protection permits agency members to "maintain an attitude of independence against the [President's] will." *Humphrey's Executor v. United States*, 295 U.S. 602, 629 (1935). And independent agencies often, though not always, share other characteristics: staggered terms; control by multi-member boards; bipartisan membership requirements and independent budgetary, litigation, adjudication, and communication authority. *See* Adrian Vermeule, *Conventions of Agency Independence*, 113 COLUM. L. REV. 1163, 1168 & n.13 (2013).

In addition to straying beyond the President's supervision, independent agencies also stray beyond the President's executive power. Ninety years ago, the Supreme Court said that independent agencies exercise "quasi legislative or quasi judicial powers." *Humphrey's Executor*, 295 U.S. at 628. So they operate in a sort of Constitutional No Man's Land: Their powers transcend Articles I, II, and III, while their leaders are accountable to no Branch, no person, and no election. The Supreme Court has recently indicated, however, that the quasi-power doctrine is ripe for reconsideration. *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (stating the NLRB likely "exercise[s] considerable executive power").[3]

---

[3] That could signal a landmark shift in the post-*Humphrey's Executor* world. The Supreme Court made the statement in an emergency order granting the Government's application for a stay of an order enjoining President Trump from removing a member of the NLRB without cause. The Court has also instructed us to consider its emergency orders, at least to some extent. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases.").

We should take seriously the Court's suggestion that NLRB members exercise executive power such that the Constitution does not permit restrictions on the President's removal power. That conclusion also comports with other lines of Supreme Court precedent. *See City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) ("[Agencies'] activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under

If the quasi-power doctrine is open to reconsideration, other tenets of independent agencies should be too. Independent agencies were originally envisioned as neutral expert commissions that would make decisions based only on expertise and science—"free from pesky things like law and an increasingly diverse electorate." *Cochran v. SEC*, 20 F.4th 194, 214 (5th Cir. 2021) (en banc) (Oldham, J., concurring), *aff'd sub nom. Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023); *see also* RONALD J. PESTRITTO, WOODROW WILSON AND THE ROOTS OF MODERN LIBERALISM 221 (2005). And *Humphrey's Executor* embraced this idealized vision of the independent agency, which would "exercise the trained judgment of a body of experts." 295 U.S. at 624. That ideal persists today. *See, e.g.*, *Wilcox*, 145 S. Ct. at 1420 (Kagan, J., dissenting from grant of application for stay) (describing independent agencies as "bodies of specialists balanced along partisan lines, which will make sound judgments precisely because not fully controlled by the White House").

But here, too, cracks in the theoretical foundation for independent agencies are readily apparent. This case illustrates the perils of non-neutral, politicized decisionmaking in an independent agency.

## II

I first (A) discuss how this case demonstrates that "independent" agencies are not so independent from politics after all. I then (B) explain that refusing to rehear the panel decision undermines the rule-of-law protections

---

our constitutional structure they *must be* exercises of—the 'executive Power.'"); *Bowsher v. Synar*, 478 U.S. 714, 732–33 (1986); *see also Freytag*, 501 U.S. at 921 (Scalia, J., concurring in part and concurring in the judgment) ("[A]djusting the remainder of the Constitution to compensate for *Humphrey's Executor* is a fruitless endeavor.").

meant to legitimize those agencies. Finally, I address (C) the only counterargument.

A

In September 2020, a panel of the NLRB unanimously held that no labor violations occurred during collective bargaining at a New Jersey ExxonMobil research facility. The union declined to seek judicial review. And Exxon obviously did not (perhaps could not?) seek judicial review because it had prevailed.

In January 2022, however, the NLRB *sua sponte* notified Exxon that it intended to vacate its previous Decision and Order and do it all over again. What changed in the interim? The Board's political composition, with a new Democratic majority appointed by President Joe Biden, who "many times" promised to lead "the most pro-union administration in American history," *Remarks by President Biden in Honor of Labor Unions*, The White House (Sept. 8, 2021), https://perma.cc/FD2Z-M2SK. And the purported basis for this extraordinary remedy? One Member owned shares in a stock sector fund that, unbeknownst to him, contained some unknown number of shares in Exxon.[4] Obviously, Exxon lost before the new Board.

---

[4] This recusal recommendation dwarfs the standard applicable to members of this court. *See Code of Conduct for U.S. Judges*, Guide to Judiciary Policy Vol. 2A, Ch. 3 at 9 (Mar. 12, 2019) ("[O]wnership in a mutual or common investment fund that holds securities is not a 'financial interest' in such securities unless the judge participates in the management of the fund."); *see also* ROA.3048 (Member Ring, dissenting from Board's Notice to Show Cause) ("[I]t is far from obvious that the Board should vacate a decision in circumstances under which vacatur would not be required for a decision by a federal judge."). And the timing of staffers' concerns also raises suspicion: The final decision regarding recusal came just one day before the Member's previously scheduled departure from the Board. *See* ROA.3050.

What is not obvious is how or why a purportedly independent agency can get away with such rough justice. Apparently, the NLRB can vacate any order it wants, no matter how old, so long as a petition for review has not been filed in our court. The consequences of that rule are far-reaching.

First, think about it from the parties' perspective. How can a prevailing employer *ever* petition for review? The NLRA authorizes petitions for review only by a "person *aggrieved* by a final order of the Board." 29 U.S.C. § 160(f). In administrative law, terms like "aggrieved" often sweep broadly, typically covering "any petitioner with an interest arguably sought to be protected by the statute." *FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1993 (2025) (quotation omitted). But that broad language does not change the constitutional requirements to invoke our jurisdiction—namely, that a petitioner must have suffered an injury in fact. *See Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). So how can a prevailing employer ever show injury stemming from an adjudication *it won*? After today's decision, however, smart employers presumably will *try*. Contrariwise, why would a losing union petition for review when it could wait a few years and try its luck before a new Board, and *then* petition if it loses?

Second, the NLRB's incentives are equally flawed. Each time its political control changes, the Board can scour its archives, handpick the decisions it disagrees with, and reopen them at will for any reason (or no reason at all). The resulting uncertainty will benefit no one: not employers, the public, or employees and their representatives. And when personnel changes dictate legal rules, it undermines faith in our "government of laws, and not of men." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). As the Board's dissenting member wrote here, "the public might well lose confidence in the judicial process if the judgments were vacated, because the parties and the courts would be forced to relitigate the case even though the

proceedings leading to those judgments seemed completely fair." *Exxon*, 371 N.L.R.B. 128 at *13 (2022) (quotation omitted).

This is far from the only example of the putatively independent Board's acting like a politically motivated agency. *Compare MV Transp., Inc.*, 368 N.L.R.B. 66 (2019) (Republican majority applying employer-friendly "contract coverage" standard), *with Endurance Env't Sols.*, LLC, 373 N.L.R.B. 141 (2024) (Democratic majority explicitly overruling *MV Transportation*); *compare also E.I. DuPont de Nemours*, 364 N.L.R.B. 113 (2016) (Democratic majority announcing new rule about changes in employment conditions), *with Raytheon Network Centric Sys.*, 365 N.L.R.B. 161 (2017) (Republican majority overruling *DuPont*), *and Wendt Corp.*, 372 N.L.R.B. 135 (2023) (Democratic majority overruling *Raytheon*); *compare also FedEx Home Delivery*, 361 N.L.R.B. 55 (2014) (Democratic majority announcing holistic independent contractor test), *with SuperShuttle DFW, Inc.*, 367 N.L.R.B. 75 (2019) (Republican majority overruling *FedEx*), *and The Atlanta Opera, Inc.*, 372 N.L.R.B. 95 (2023) (Democratic majority overruling *SuperShuttle*). *See also* William B. Gould IV, *Politics and the Effect on the National Labor Relations Board's Adjudicative and Rulemaking Processes*, 64 Emory L. J. 1501 (2015) (describing similar position changes throughout the Board's history). Unsurprisingly, "the Board's work is widely acknowledged as politically charged." *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 778 & n.96 (5th Cir. 2025) (collecting examples), *petition for cert. filed* (Nov. 21, 2025) (No. 25-622).

None of this is to suggest that *executive* agencies cannot or should not follow the President's political agenda. To the contrary—those agencies can and should wield the President's executive power, subject to his executive control. But so-called independent agencies receive statutory and constitutional privileges by virtue of their "independence" from politics. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 531 (2010)

(Breyer, J., dissenting) (quotation omitted) (an independent agency's "constitutional legitimacy" derives from its "apolitical" and "technical expertise"). And too often an agency's "independence" is just a myth, and its supposed expertise becomes subservient to its political agenda.

B

Today's precedent endows the NLRB with independence not just from presidential supervision, but also from bedrock rule-of-law principles. The panel holds that nothing can limit the Board's statutory authority to reopen long-dormant cases. Even an unreasonable delay would be permissible. *See ExxonMobil Rsch. & Eng'g Co., Inc. v. NLRB*, 132 F.4th 337, 347–48 (5th Cir. 2025). The panel justifies this conclusion on the ground that reasonableness limits only the Board's "*inherent* authority" but not its "*statutory* Section 10(d) authority." *Ibid*. But why is that true? We aim to interpret statutes to "produce[] a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). And countless legal principles—especially finality and repose—counsel against the panel's reading. *See, e.g.*, 5 U.S.C. § 555(b) (agencies must "proceed to conclude" matters within a "reasonable time"); *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 321 (1961) (stating that "finality" is a "polic[y]" that "immediately demand[s] recognition" "[w]henever a question concerning administrative, or judicial, reconsideration arises"); *Macktal v. Chao*, 286 F.3d 822, 826 (5th Cir. 2002) (An agency's reconsideration of a prior decision "must . . . occur within a reasonable time").

We would never tolerate that approach from a federal court: Imagine the justifiable outcry if a batch of new judicial appointees decided to reopen long-final judgments for political purposes. *Cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (holding that retroactively reopening cases can violate

the Due Process Clause). So why should we tolerate it from an independent agency? *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 149 (2015) (holding that "a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata . . . as a judgment of a court" (quotation omitted)). And why should "independent" agencies have the power to render dispositive, preclusive judgments *as if* they were courts—but without the attendant limitations that subordinate courts to the rule of law?[5]

C

Finally, a word about today's concurring opinion. My esteemed colleague thinks that the full court should not rehear this case because Exxon raises a new First Amendment claim in its en banc brief. *Ante*, at __ (Ho, J., concurring). "We must be on guard for the risk of judicial bias when it comes to discretionary practices such as addressing forfeited issues." *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021). But everyone, including the panel and all parties, agree that Exxon preserved all dimensions of its claim relating to the Board's authority to reopen decisions. So it is odd, to say the least, to imagine a forfeiture problem and then vote no on this poll as punishment for the failure of an unrelated poll. *Ante*, at __ (invoking *Siders v. City of Brandon*, 130 F.4th 188 (5th Cir. 2025) (en banc)); *see also ante*, at

---

[5] The panel gives *res judicata* short shrift, saying it "is only implicated when a second, later suit involves the same parties and causes of action as a first, final suit." *Exxon*, 132 F. 4th at 347. It is apparently very significant that "[t]his case, by contrast, involves just one decision that was vacated—removing the finality of that decision—and then redecided." *Ibid.* Such an illusory vision of finality—where the judgment-issuing body may bestow and rescind "finality" by fiat—undermines the very concept of a final judgment. While this scenario does not technically involve two suits, it raises the same concerns: "[T]he expense and vexation attending multiple lawsuits, conserving judicial resources, and fostering reliance . . . by minimizing the possibility of inconsistent verdicts." *B&B Hardware*, 575 U.S. at 147 (citation modified).

___ (insisting Exxon is right anyway, notwithstanding the purported "forfeiture").

* * *

The NLRB generally and this case specifically illustrate important rule-of-law problems that can apply to independent agencies. We should have reheard the case en banc. I respectfully dissent.